**COLONIAL GAS CO., Plaintiff,**

v.

**The AETNA CASUALTY & SURETY CO., Defendant.**

Civ. A. No. 89–1106–WD.

United States District Court,
D. Massachusetts.

May 21, 1993.

---

Scott P. Lewis, Tamara S. Wolfson, Palmer & Dodge, Boston, MA, for plaintiff.

James L. Ackerman, Kathleen S. Moore, Day, Berry & Howard, Boston, MA, for defendant.

## MEMORANDUM AND ORDER

WOODLOCK, District Judge.

### I

The Colonial Gas Company is a Massachusetts public utility; Aetna Casualty & Surety Company, a Connecticut corporation, is Colonial's general liability insurance carrier. When Aetna denied coverage of a $600,000 claim made by Colonial, Colonial filed this breach of contract action.

In 1987, Colonial paid $600,000 to a trust fund ("UFFI Trust") administered by the Massachusetts Department of Public Health. The UFFI Trust, established by statute, is intended to compensate owners of urea-formaldehyde foam insulated homes. M.G.L. c. 111, § 5; Stat.1985, c. 728. Colonial had sold about 390 of its customers UFFI insulation until the state's Commissioner of Public Health banned UFFI in 1979, and promulgated "repurchase" regulations, requiring sellers and installers of UFFI to remove it at their own cost. By contributing to the UFFI Trust, Colonial extinguished certain liabilities to those 390 homeowners, including liabilities under the mandatory repurchase requirements.

Colonial moves for summary judgment, arguing that its Aetna policies covered liabilities under the repurchase regulations; therefore, Aetna must also cover its reasonable settlement of those claims. Aetna makes a cross-motion for summary judgment, alleging that Colonial did no more than make a voluntary $600,000 contribution to the UFFI Trust, a donation for which there is no insurance coverage.

### II

In assessing the parties' motions for summary judgment, I must view the record in the light most favorable to the non-moving party and indulge all inferences favorable to that party. *Villanueva v. Wellesley College*, 930 F.2d 124, 127 (1st Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 181, 116 L.Ed.2d 143 (1991). The motion should be granted only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). As the parties agree, there are no genuine issues of material fact here.

Between 1977 and 1979, a predecessor company to Colonial, Cape Cod Gas ("Colonial" hereafter), promoted to its customers the use of UFFI insulation. About 390 of them chose to participate in Colonial's insulation program. Those residential gas users paid Colonial to have an independent contractor insulate their homes by pumping into exterior walls a mixture of urea-formaldehyde resin and a foaming agent. Shortly after its insertion, the mixture hardens, affixing itself to the insides of walls, joists, and studs.

In 1979, the Commissioner of Public Health banned all uses of UFFI. In 1984, in amendments to regulations first established in 1980, the Commissioner required dealers, installers, manufacturers, and distributors, on demand, to remove UFFI from buildings in which it had been placed, fully to restore those buildings, and to refund the buyers' insulation purchase price. 105 Code Mass. Regs. § 650.222 ("repurchase regulations"). "The commissioner's regulations were based on his findings that formaldehyde and UFFI were toxic, irritant, hazardous substances and that the potential for release of formaldehyde from UFFI into the indoor environments of buildings in which it is used as insulation justified its ban." *Borden, Inc. v. Commissioner of Public Health*, 388 Mass. 707, 709, 448 N.E.2d 367, *app. dism'd*, 464 U.S. 923, 104 S.Ct. 323, 78 L.Ed.2d 296, *cert. denied*, 464 U.S. 936, 104 S.Ct. 345, 78 L.Ed.2d 312 (1983). These repurchase regulations were in effect a strict liability statute; an industry member's only defense against a demand was that it had not supplied UFFI to the subject building. 105 CMR § 650.-622(4).

More than 100 homeowners who had paid Colonial for UFFI installation filed repurchase requests under the Department of Public Health regulations. Further, a group of Colonial's UFFI customers filed a class action suit, which a Massachusetts judge refused to certify, leaving the plaintiffs to pursue individual actions for recovery. *Fletcher v. Cape Cod Gas Co.*, 394 Mass. 595, 477 N.E.2d 116 (1985).

In 1985, the Massachusetts legislature passed the UFFI Act (St.1985, c. 728), authorizing the Department of Public Health to establish a UFFI Trust Fund to meet the costs of formaldehyde testing in residences, and, when required, the costs of UFFI removal. In late 1985, the Department of Public Health requested a $950,000 contribution from Colonial to the UFFI Trust. Colonial wrote Aetna, asserting this was a covered liability under its insurance policies; Aetna disclaimed coverage. In December, 1987, after negotiations, Colonial paid $600,000 to the UFFI Trust.[1] Under the rules establishing the Trust, that payment by Colonial ended its liability under the repurchase regulations. Further, any homeowner claiming benefits under the UFFI Trust, including formaldehyde testing, must forego all tort claims against contributing industry members, except for damages for bodily injury not reasonably discoverable at the time of the claim. Stat.1985, c. 728(5).

### III

Colonial maintains that "[t]he essential question presented is whether the Aetna policies covered claims against Colonial under the UFFI repurchase regulations, and must therefore[ ] be found to cover Colonial's settlement payment to the UFFI Trust Fund." Colonial's Memorandum in Support of Summary Judgment at 7. Aetna answers that Colonial's Trust Fund payment was voluntary, that it was not compensation for damages from bodily injury, and that "[t]here simply is no rationale linking the donation to any type of physical harm during any policy period." Aetna's Opposition to Summary Judgment at 3. Thus Aetna wishes to focus on Colonial's allegedly "voluntary" payment into the Trust, while Colonial emphasizes that its payment, even if voluntary in the

---

1. Aetna does not dispute that Colonial's $600,000 payment to the UFFI Trust was reasonable. The Department of Public Health estimates that removing UFFI from a single home costs on average $15,000. Colonial's Statement of Material Facts, ¶ 40. The cost of removal for the more than 100 homeowners who made repurchase requests would thus exceed $1,500,000. Aetna does, however, question one aspect of the use to which the settlement monies are to be put. *See* note 5 *infra*.

sense that Aetna did not give prior approval, nonetheless was made to extinguish a covered loss.

■ Colonial bears the burden of proving that its $600,000 payment, given the purpose for which it was made, is among the risks covered by Aetna's policy. *Markline Co. v. Travelers Ins. Co.*, 384 Mass. 139, 140, 424 N.E.2d 464 (1981). If Colonial establishes its loss is covered, the burden of proof shifts to Aetna, to demonstrate that the loss falls within an exclusion or exception to its general liability coverage. *Camp, Dresser & McKee, Inc. v. Home Ins. Co.*, 30 Mass.App. Ct. 318, 321, 568 N.E.2d 631 (1991). At the threshold I confront Aetna's contention that Colonial's Trust Fund payment was alternatively premature or voluntary before turning to the coverage/exclusion issue and then the problem of characterizing the "occurrence."

–A–

On the issue of voluntariness and prematurity, Aetna relies chiefly on two cases, *Marvel Heat Corp. v. Travelers Indemnity Co.*, 325 Mass. 682, 92 N.E.2d 233 (1950) and *Augat, Inc. v. Liberty Mutual Ins. Co.*, 410 Mass. 117, 571 N.E.2d 357 (1991). *Marvel* has little vitality in the context presented here and *Augat* involves a distinguishable fact pattern.

■ In *Marvel Heat*, the policy holder notified its insurer of a claim, and the insurer disclaimed liability on the policy. The insured hired a lawyer, settled the claim, and sued the insurer to recover its costs. Because the customer had not yet brought an action against the insured, the SJC declined to "interpret the defendant's action as a denial of liability in any event, or as the equivalent of a refusal to defend an action." 325 Mass. at 685, 92 N.E.2d 233. Whether *Marvel* remains good law when a private lawsuit has not yet been commenced is open to question. As Judge Garrity observed in *Keith Fulton & Sons, Inc. v. Continental Ins. Co. of City of N.Y.*, 273 F.Supp. 486 (D.Mass. 1967), requiring an insured to go "through the motions of inviting and answering a lawsuit" when having "no genuine defense" would be "contrary to the public policy of

guarding the courts against unnecessary litigation," *id.* at 490–91. The subsequent enactment of the Massachusetts Unfair Claims Settlement Practices Act, M.G.L. c. 176D, § 3(9)(f), which requires insurers to "effectuate prompt, fair and equitable settlement of claims in which liability is clear" does not permit insurers to require the formality of the filing of a lawsuit before settlement responsibilities are implicated. Moreover, *Marvel* is plainly inapposite in the context of claims—such as those here—which are embraced by a complex governmental administrative remedial scheme. In such a dynamic context, the defense and settlement process is implicated at a stage well before a formal law suit is actually filed. This is because lack of a prefiling settlement in this context could result in an additional and severe compromise of the insured's interests. *See generally, Avondale Industries, Inc. v. Travelers Indemnity Co.*, 697 F.Supp. 1314, 1321 (S.D.N.Y.1988) ("there was nothing the party asserting the claim against [Marvel Heat] could do between the occurrence of the tort and the initiation of a lawsuit that would adversely affect the insured's rights, because the claims were for common law torts"; "[o]n the other hand ..., the government has discretion in choosing the responsive action in combatting pollution sites"[:] "[b]y choosing a more expensive option, the government can adversely affect the insured's rights"). *Marvel*, in short, does not govern when formal proceedings have commenced on several fronts as they had over the UFFI claims.

Aetna summarizes *Augat*, the second pillar of its argument, as follows: "the insured 'voluntarily' entered into an agreement with the Commonwealth to decontaminate a hazardous waste site. The insured's policy contained the same 'voluntary payment' provision as in Colonial's policies. The *Augat* court held that the insured's breach of the 'voluntary payment' provision undermined the insurer's opportunity to protect its interests," and held the voluntary payment was not a covered liability. Aetna's Memorandum in Support of its Cross–Motion for Summary Judgment at 15. However, *Augat's* settlement was voluntary for policy purposes because the insured neglected to request its insurer to defend it and to pay for damages.

410 Mass. at 122, 571 N.E.2d 357. Unlike the present case, in *Augat* no notice was provided the insurer until after the settlement was complete.

■ Unlike both *Augat* and *Marvel Heat,* the 100 homeowners who made requests for removal of UFFI installed by Colonial to the Massachusetts Department of Public Health had, under the regulations, instituted administrative proceedings. 105 CMR § 650.-622(1)–(9). Such administrative proceedings constitute suits of which Aetna had notice. Cf. *Hazen Paper Co. v. United States Fidelity & Guaranty Co.,* 407 Mass. 689, 693, 555 N.E.2d 576 (1990) (EPA letters of notification asserting release of hazardous substances "had the same practical effect as the filing of a complaint in a legal action"). In short, the Colonial Gas payment to the Trust Fund was neither premature nor voluntary.

–B–

■ Generally, insurers which make "unjustified disclaimer decisions" are "liable for the reasonable costs of both defense and settlement." *Camp, Dresser,* 30 Mass.App. Ct. at 326, 568 N.E.2d 631. Thus I will examine whether Colonial's liability under the repurchase regulations was covered or justifiably disclaimed. In this regard, I must "consider what an objectively reasonable insured, reading the relevant policy language, would expect to be covered." *Hazen Paper Co.,* 407 Mass. at 700, 555 N.E.2d 576.

Colonial's general liability policies, purchased from Aetna in 1977, 1978, and 1979, provide that Aetna shall, consistent with coverage limits, pay

all sums which the insured shall become legally obligated to pay as damages because of bodily injury or property damage to which this insurance applies, caused by an occurrence.

An "occurrence" is a defined term, meaning:

an accident, including a continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured.

"Bodily injury" is "bodily injury, sickness or disease"; "property damage" is:

(1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period.

Colonial's Statement of Material Facts, ¶¶ 7–9. Further, under the policies, Colonial could not, "except at its own cost, voluntarily make any payment, assume any obligation, or incur any expense."[2] Aetna's Statement of Material Facts, ¶ 7.

I will assume, without deciding, that Aetna is correct in asserting that the nature and extent of any resident's physical injury from Colonial's installation of UFFI is either prospective or unproven, or at least was so at the time of Colonial's $600,000 payment into the UFFI Trust. The Commissioner's repurchase regulations were promulgated under G.L. c. 94B, §§ 1–2, permitting the ban of "any substance or mixture of substances which is toxic, corrosive, an irritant, a strong sensitizer, . . . if such substance or mixture

---

2. Aetna asserts several other clauses of the insurance contracts are relevant to this dispute. The policies do not apply (a) "to property damage to Colonial's products arising out of such products or any part of such product," or (b) "to property damage to work performed by or on behalf of Colonial arising out of the work or any portion thereof, or out of materials, parts of equipment furnished in connection therewith." Aetna's Statement of Material Facts, ¶¶ 7–9. As to exception (a), neither party alleges that the installed UFFI has sustained any damage. Rather, the claim is that UFFI may have damaged dwellings or injured their inhabitants. Thus, this exception is not pertinent. *See Aetna Casualty & Surety Co.*

*v. PPG Industries, Inc.,* 554 F.Supp. 290 (D.Ariz. 1983) (damage to building, not to insulation itself); *compare Biebel Brothers, Inc. v. United States Fidelity and Guaranty Co.,* 522 F.2d 1207 (8th Cir.1975) (roofer damaged his own underlayment when applying roofing asphalt; coverage exclusion (a) bars claim). For its part, exclusion (b) also applies only to damage of the insured's own product or work. *Honeycomb Systems, Inc. v. Admiral Ins. Co.,* 567 F.Supp. 1400, 1408 (D.Me.1983); *Frankel v. J. Watson Co.,* 21 Mass.App.Ct. 43, 45–46, 484 N.E.2d 104 (1985), *rev. denied,* 396 Mass. 1105, 487 N.E.2d 855 (1986).

of substances may cause substantial personal injury or substantial illness...." And although there is no showing that the mere installation of UFFI in a home ineluctably causes physical injury to residents, I find Colonial's installation of UFFI did cause property damage to the dwellings, and removal costs flowing from that installation remain covered losses. *See Hazen*, 407 Mass. at 698, 555 N.E.2d 576 ("release of hazardous material involves property damage")[3]; *Coordination Proceeding Asbestos Coverage Cases*, Judicial Counsel Coordination Proceeding No. 1072 (Cal.Sup.Ct., August 29, 1988), slip op. at 14 ("The release of a harmful substance onto an area is a 'physical injury to tangible property'"); *American Protection Insurance Co. v. McMahan*, 151 Vt. 520, 562 A.2d 462, 466 (1989) (claim stated by allegation that "presence of toxic material [UFFI] in the walls of their house constitutes 'destruction of tangible property'").

"UFFI releases formaldehyde," first while it is curing and then in varying amounts over the course of years, depending on temperature and humidity, and the quality of installation, among other factors; "UFFI cannot be avoided without abandoning the house itself. UFFI once installed becomes indistinguishable from the home." *Commissioner's Summary of the Evidence and Findings and Conclusions Concerning Formaldehyde and UFFI* at 37, 27 and n. 3, 36, 100; Colonial's Appendix to Statement of Material Facts, Vol. 1 at 170, 160, 169, 236. Property damage is done when UFFI is installed in a home: the residence is "'doomed immediately' upon incorporation." *Baugh Constr. Co. v. Mission Ins. Co.*, 836 F.2d 1164, 1170 (9th Cir.1988) (incorporation of concrete into multi-story residence). *See* Note, *Urea Formaldehyde Foam Insulation: Defusing a Timebomb*, 11 Am.J.L. & Med. 81 (1985).

In *Hazen*, 407 Mass. at 695, 555 N.E.2d 576, the Supreme Judicial Court held that while the EPA's demand that Hazen pay for and participate in remedial action for "actual releases of hazardous substances" alleged a covered claim of property damage, the Massachusetts Department of Environmental Quality Engineering's assertion that Hazen was responsible for a "threat of the release of hazardous material from certain 'overpacked drums'" did not allege damage within policy coverage. Aetna claims that UFFI is more like the case of the hazardous material in the drums than it is like Hazen's contamination of soil alleged by the EPA.

UFFI is classified as a toxic and hazardous substance, and its sale and distribution in the Commonwealth is completely forbidden. 105 CMR § 650.020. UFFI is not merely banned when it is releasing measurable quantities of formaldehyde. It is banned altogether. Thus the installation of UFFI in a home has in effect been legislatively determined to be the release of a hazardous substance between the walls of a dwelling. As soon as UFFI has been installed, by definition a hazardous substance has been released into the home. Under the repurchase regulations, the homeowner need not inquire into the formaldehyde level in his residence; he has an absolute right to demand repurchase (including removal costs, such as repairing the walls of his house). So too the EPA did not need to prove that Hazen's releases of hazardous substances contaminated groundwater; the mere release of hazardous substances was enough to make out a claim for physical injury.[4] *Hazen*, 407 Mass. at 698, 555 N.E.2d 576.

 In the language of Aetna's general liability coverage, Colonial was "legally obligated to pay as damages because of ...

---

3. The installation of UFFI in a home is a release of hazardous material; on installation, UFFI's emission of formaldehyde is also a release.

4. Colonial argues, persuasively, that the incorporation of formaldehyde-based insulation into a building constitutes physical damage in the same way that incorporating asbestos into a building does. "[I]t makes sense to view the incorporation of [asbestos insulation] as a physical injury. Once installed, [asbestos insulation] is physically present in the buildings and affects them in

a physical way, as opposed to an intangible, non-physical manner," *Coordination Proceeding Asbestos Coverage Cases*, slip op. at 12–13; property damage includes "incorporation of an allegedly toxic substance in ... building [which] has physically altered it in a manner which makes it harmful ..., and ... the physical damage to the property may be measured by the cost of repairing the walls to make them safe," *Shooshanian v. Wagner*, 672 P.2d 455, 464 (Alaska 1983).

property damage ... caused by an occurrence" when customers made claims under the repurchase regulations. The occurrence, for policy purposes, stemmed from Colonial's installation of a hazardous substance in about 400 homes. Colonial settled about 100 actual repurchase demands and three hundred potential additional demands for $600,000. The repurchase program ensured the removal of the hazardous material from such homes, when necessary.[5] Such costs of removal are damages flowing from the damage to property. Massachusetts is among the majority of states in holding that "[w]hen pollution has occurred, cleanup costs are damages within the policy language because in that circumstance the word 'damages,' which is not defined [beyond loss of use or destruction of property] in the policy, is ambiguous. If there are two rational interpretations of policy language, the insured is entitled to the benefit of the one that is more favorable to it." *Hazen,* 407 Mass. at 700, 555 N.E.2d 576 (citations omitted). Even without giving Colonial Gas that benefit, I am satisfied that Colonial Gas has established coverage and Aetna has failed to establish any exclusion. In any event, the proper standard for reviewing an insurer's disclaimer decision is "what an objectively reasonable insured, reading the relevant policy language, would expect to be covered." *Hazen,* 407 Mass. at 700, 555 N.E.2d 576. Colonial Gas had such a reasonable expectation of coverage. I turn to consideration of when the covered event occurred.

–C–

Courts have found determining when an "occurrence" occurred, that is, when the actual damage took place, to be a vexed problem. *See In re Acushnet River & New Bedford Harbor,* 725 F.Supp. 1264, 1274–1275 (D.Mass.1989) (setting out six theories recognized by various courts: wrongful act; exposure; injury-in-fact; manifestation; first discovery; continuous trigger) (citing cases), *aff'd in part, rev'd in part,* 938 F.2d 1423 (1st Cir.1991). The Supreme Judicial Court has rejected the wrongful act theory, but has declined to indicate which of the other theories Massachusetts courts would adopt. *Lumbermens Mutual Casualty Co. v. Belleville Industries, Inc.,* 407 Mass. 675, 686–88, 555 N.E.2d 568 (1990), *cert. denied,* —— U.S. ——, 112 S.Ct. 969, 117 L.Ed.2d 134 (1992). I have found the property damage caused by UFFI occurs upon installation. This is consistent with the "occurrence" formulations the Supreme Judicial Court is prepared to entertain.[6] The occurrences at issue here thus took place between 1977, when Colonial first installed UFFI, and 1979, when the

---

5. Aetna alleges that because some UFFI Trust funds go to formaldehyde testing, and because such testing is not covered under Colonial's general liability policy, the settlement is not a covered loss. That argument is meritless. If Colonial's settlement with the Department of Health is fair and reasonable, and amounts to just damages given a disputed claim, that is the end of the matter. Those entitled to recovery can spend the sums recovered on whatever they wish. Moreover, testing expenses here seem especially appropriate for purposes of insuring that the settlement monies are fairly and efficiently applied to the damages.

6. The Massachusetts Appeals Court in a recent decision seems to construe the holding of the Supreme Judicial Court in *Continental Cas. Co. v. Gilbane Bldg. Co.,* 391 Mass. 143, 152, 461 N.E.2d 209 (1984) ("the time of the occurrence of an accident within the meaning of an indemnity policy is not the time the wrongful act was committed, but the time when the complaining party was actually damaged") (citation omitted) to mean that the discovery rule applies to property damage claims. *Frohberg v. Merrimack Mutual Fire Ins. Co.,* 34 Mass.App.Ct. 462, 464–65, 612 N.E.2d 273 (1993) (buyer's "asserted property damage was not actually sustained until after they had discovered the UFFI ..., lost their enjoyment or use of the premises, had to relocate, and had to expend money to remove the UFFI"). However, the SJC, as noted above, has declined to adopt the discovery rule for dating occurrences; and no particular rule for determining when an occurrence occurred was necessary to the *Frohberg* court's decision. The question presented in *Frohberg* was whether a buyer of a UFFI-contaminated home could have sustained personal injury or property damage during the *seller's* policy period, when the seller's policy was cancelled at closing. The Appeals Court concluded summary judgment was properly allowed the insurance company, for "none of the [buyer's] damages were alleged to have occurred prior to [seller's] termination of her homeowner's policy." *When,* after closing, the buyer was injured was not a necessary part of the Appeals Court's judgment: nothing turned on applying the discovery rule as opposed to any other rule permitted by the SJC.

insulation was banned by the Commissioner. Accordingly, the damages are covered by Colonial's Aetna policies for one or more of those years.

■ However, because of the technical requirements of the policies, treating deductibles and retrospective rating formulas, more precision in defining occurrence is necessary. Therefore, as is required by the reasons I have set forth more fully above (including the diminution of value of the property; the presence of a hazardous substance, UFFI, in the home; and the commencement of the release of formaldehyde), I find that under the repurchase regulations, and Colonial's settlement therefor, property damage occurred when Colonial had UFFI installed in its customers homes.[7]

Massachusetts courts have not addressed the question of whether, in this kind of case, each installation of UFFI into a home would comprise a single occurrence, or whether Co-

lonial's entire 400 home UFFI program is a single occurrence.[8] Determining the application of Aetna's policy language to these facts is a question of law, and "any doubts as to the meaning of words must be resolved against the insurance company that employed them and in favor of the insured." *Cody v. Connecticut General Life Ins. Co.*, 387 Mass. 142, 146, 439 N.E.2d 234 (1982).

■ I find, consistent with the rule in the majority of states, that the number of occurrences turns on the underlying cause of the property damage, and where, as here, there is a single cause—Colonial's use of UFFI in its insulation program—there is a single occurrence. *See generally, Chemstar, Inc. v. Liberty Mutual Insurance Co.*, 797 F.Supp. 1541 (under policy's definition of occurrence as "continuous or repeated exposure to conditions," 28 property damage claims from plaster installed between 1985 and 1988 constituted single occurrence) (citing cases), modified, 92 Daily Journal DAR 10,735

---

7. This is consistent with the First Circuit's construction of the meaning of "physical injury to tangible property" clauses. "... [A]lthough a number of courts have held that intangible losses, such as loss of use or diminution of value, are 'property damage' [citations omitted], all such decisions had interpreted policy language defining property damage as 'injury to tangible property' rather than '*physical* injury to tangible property.' In cases in which courts have interpreted more recent policies in which property damage is defined as 'physical' injury to tangible property, such courts have held that intangible damages, such as diminution in value, are not considered property damage." *American Home Assur. Co. v. Libbey–Owens–Ford Co.*, 786 F.2d 22, 25 (1st Cir.1986). In the present case, the intangible damages, including diminution in value, are linked to tangible damages, a UFFI and formaldehyde-impregnated home. (Unlike asbestos, UFFI cannot be made safe; "UFFI cannot be avoided without abandoning the house itself." Commissioner's Summary at 100. *See also* note 4, above.) When the wrongful act of installing UFFI was committed, the homeowners were simultaneously actually damaged.

The Seventh Circuit has criticized the traditional distinction between physical and economic loss as "a poor choice of words—all the losses for which tort victims sue are economic," and has held broadly:

the drafting history of the property-damage clause, and the probable understanding of the parties to liability insurance contracts, persuade us that the incorporation of a defective product into another product inflicts physical

injury in the relevant sense on the latter at the moment of incorporation.

*Eljer Manufacturing, Incorporated v. Liberty Mutual Insurance Company*, 972 F.2d 805, 811, 814 (7th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1646, 123 L.Ed.2d 267 (1993). *See also Aetna Casualty & Surety Co. v. PPG Industries, Inc.*, 554 F.Supp. 290, 293 (D.Ariz.1983) (although "diminution in the value of ... buildings caused by the installation of defective or hazardous insulation ... is [an] economic harm and is not actionable as property damage under the [Arizona common law] theories of strict liability and negligence ... [a]n allegation of damages to property is more limited than and, therefore, cannot be equated with the term 'property damage' as used in an insurance clause"). I need not adopt such broad reasoning, however. *Eljer* concerned the incorporation into homes of plumbing fixtures, a certain percentage of which were defective. Before an accident, homeowners might only know there was a defined chance their plumbing would fail; not all homeowners had plumbing that would *actually* fail. That situation is unlike that of a homeowner with UFFI in the walls of her home, for all UFFI, not merely some, fails as a safe insulating material, and physically damages the walls and other parts of the home through release of formaldehyde.

8. *Worcester Insurance Co. v. Fells Acres Day School, Inc.*, 408 Mass. 393, 558 N.E.2d 958 (1990), *Slater v. United States Fidelity & Guaranty Co.*, 379 Mass. 801, 400 N.E.2d 1256 (1980) (both treating "single occurrence," but not in the context of environmental harms such as those at issue in this case).

(C.D.Cal.1992); *Champion International Corp. v. Continental Casualty Co.*, 546 F.2d 502, 505–6 (2d Cir.1976); *cert. denied*, 434 U.S. 819, 98 S.Ct. 59, 54 L.Ed.2d 75 (1977) (claims for defective vinyl panelling installed in 1400 vehicles arose from single occurrence, insured's sale of panelling). *See also* What Constitutes Single Accident or Occurrence Within Liability Policy Limiting Insurer's Liability to a Specified Amount Per Accident or Occurrence?, 64 A.L.R.4th 668, 673, 676–77 (1988) (citing cases adopting majority causation rule). There appears to be no dispute that Aetna has already applied its single per occurrence limit of $100,000 for retrospective premium and deductible charges for UFFI damages. Colonial's Statement of Material Facts, ¶ 10. Under the circumstances, Aetna is entitled to apply no further premiums or charges against this single occurrence.

–IV–

For the reasons more fully set forth above, I conclude that Colonial's $600,000 contribution to the UFFI Trust Fund was settlement for a single occurrence—Colonial's UFFI installation program in 400 homes—and that the covered damages, for which Aetna is required to indemnify Colonial, occurred within the policy period, 1977 to 1979. Colonial's motion for summary judgment as to Count I of its complaint is granted; and Aetna's cross-motion for summary judgment on its counterclaim is denied.[9] The clerk shall enter final judgment accordingly.

**FINAL JUDGMENT**

In accordance with this Court's Memorandum and Order issued on May 21, 1993, allowing the plaintiff's motion for summary judgment as to Count I of its complaint and denying the defendant's cross-motion for summary judgment on its counterclaim, it is hereby ORDERED

Judgment for the plaintiff against the defendant on Count I of its complaint.

---

9. The parties have stipulated to the dismissal of Counts II and III. Count IV is Colonial's request for a declaratory judgment on the meaning of "occurrence" in Aetna's policies. That matter is resolved by the present order.