**BUILDERS MUTUAL INSURANCE COMPANY, Plaintiff,**

v.

**DRAGAS MANAGEMENT CORPORATION, Defendant, Crossclaim Plaintiff, and Crossclaim Defendant,**

and

**Firemen's Insurance Company of Washington, D.C., Defendant, Crossclaim Defendant, and Crossclaim Plaintiff,**

and

**Dragas Management Corporation, Hampshires Associates, LC, and Dragas Associates X, LC, Counterclaim Plaintiffs,**

v.

**Builders Mutual Insurance Company, Counterclaim Defendant,**

and

**Dragas Management Corporation, Third–Party Plaintiff,**

v.

**Hanover Insurance Company, and Citizens Insurance Company of America, Third–Party Defendants.**

**Civil Action No. 2:09cv185.**

United States District Court,
E.D. Virginia,
Norfolk Division.

June 13, 2011.

Danny M. Howell, Esquire, Sands Anderson Marks & Miller, McLean, VA, Lisa T. Hudson, Esquire, Sands Anderson Marks & Miller, Richmond, VA, for Plaintiff, Builders Mutual Insurance Co.

Richard J. Conrod, Jr., Esquire, Kaufman & Canoles PC, Norfolk, VA, for Defendant, Dragas Management Corp., and Counterclaim Plaintiffs, Hampshires Associates, LC, Dragas Associates X, LC.

John B. Mumford, Jr., Esquire, Hancock Daniel Johnson & Nagle PC, Glen Allen, VA, for Defendant, Firemen's Insurance Co.

Thomas S. Garrett, Esquire, Harman Claytor Corrigan & Wellman, Richmond, VA, for Third–Party Defendants, Hanover Insurance Co., Citizens Insurance Co.

## OPINION AND FINAL ORDER

REBECCA BEACH SMITH, District Judge.

This case comes before the court on motions for summary judgment from all parties. Specifically, the court considers Dragas Management Corp.'s ("DMC") motion for partial summary judgment against Builders Mutual Insurance Co. ("BMIC"), *see* Docket # 117; Firemen's Insurance Co. of Washington, DC's ("FIC") motion for summary judgment against DMC, *see* Docket # 142; BMIC's motion for summary judgment against DMC, *see* Docket # 146; and Citizens Insurance Co. of America ("Citizens") and Hanover Insurance Co.'s ("Hanover") joint motion for summary judgment against DMC, *see* Docket # 160. For the reasons which follow, the court **GRANTS** BMIC's, FIC's, and Hanover's motions for summary judgment. Thus, the court **DENIES** DMC's motion for partial summary judgment against BMIC.

## I.

DMC is a corporation engaged in business as a real estate development and management company. This case arises from the construction of two of DMC's developments, The Hampshires at Greenbriar ("The Hampshires") in Chesapeake, Virginia, and Cromwell Park at Salem ("Cromwell Park") in Virginia Beach, Virginia. The Hampshires was developed and sold by Hampshires Associates, L.C., a limited liability company whose members are DMC, Helen E. Dragas, Anita Dragas Weaver, Mary Dragas Shearin, and Jennifer Dragas Stedfast. Cromwell Park was developed and sold by Dragas Associates X, L.C., a limited liability corporation whose members are DMC, Anita Dragas Weaver, Mary Dragas Shearin, and Jennifer Dragas Stedfast. The Hampshires consists of 178 condominiums while Cromwell Park has 132.

DMC was the general contractor for the construction of both The Hampshires and Cromwell Park. As part of its management of the construction of the projects, DMC entered into subcontract agreements with The Porter–Blaine Company ("Porter–Blaine") to procure and install drywall at both developments.[1] Due to a shortage of domestic drywall, Porter–Blaine purchased some of the drywall installed in both developments from the Taishan Gypsum Co. Ltd., f/k/a Shandong Taihe Dongxin C. Ltd., a drywall producer in China. In total, Porter–Blaine installed the Chinese drywall at seventy-four (74) homes built by DMC: sixty-eight (68) at The Hampshires and six (6) at Cromwell Park.

## A.

The homes where Chinese drywall had been installed exhibited corrosion, tarnishing, blackening and pitting of metal components such as electrical wiring, natural gas supply lines, plumbing fixtures, electrical connectors, and HVAC coils. Addition-

[1]. The contract for The Hampshires was dated February 3, 2005. DMC had four separate agreements with Porter–Blaine for Cromwell Park, dated December 4, 2003, July 30, 2004, September 28, 2004, and September 20, 2005.

ally many homeowners reported a bad smell inside the house. DMC commenced an investigation after receiving such complaints in both developments, and discovered the presence of Chinese drywall. Upon further testing, the Chinese drywall used in the developments was found to have elevated concentrations of elemental sulfur that were approximately 375 times greater than in representative samples of domestic-manufactured drywall. Reduced sulfur gases[2] from this large concentration of sulfur caused the corrosion, pitting, blackening, and odor in the homes affected.

As a result of this discovery, DMC formulated a remediation plan and executed a remediation agreement with each homeowner. Initially, DMC sent a letter notifying each affected homeowner that DMC would be conducting a home inspection to confirm the presence of Chinese drywall and survey the damage. Afterwards, DMC representatives held homeowners meetings on February 12, 2009, and February 22, 2009, during which they explained the inspection process. The reactions from the affected homeowners were mixed. Several homeowners sent demand letters to DMC, threatening legal action if DMC did not buy back their homes. Other homeowners retained attorneys who contacted DMC directly.[3] Though the decision to remediate was made on a house by house basis, from the beginning, DMC sought to create a remediation program, and began offering such remediation to homeowners as soon as February 24, 2009. Eventually, DMC signed a remediation agreement with each affected homeowner, and in return the homeowner executed a release of all property damage claims against DMC. In each agreement, DMC agreed to remove and replace all of the Chinese drywall, replace all affected electrical components and damaged carpet, pay all condominium fees and relocation expenses, and compensate the homeowner for all damaged personal property.

## B.

While it was negotiating with homeowners, DMC also took steps to notify its insurers that it would be making a claim for the costs associated with the presence of the Chinese drywall. During the relevant time frame, DMC was covered by five different insurance policies, three of which are BMIC policies and two of which are FIC policies. The court previously covered the content of these policies in depth in its opinions related to BMIC and FIC's motions to dismiss, *see Builders Mut. Ins. Co. v. Dragas Mgmt. Corp.*, 709 F.Supp.2d 432 (E.D.Va.2010) [hereinafter *Dragas I* ]; and *Builders Mut. Ins. Co. v. Dragas Mgmt. Corp.*, 709 F.Supp.2d 441 (E.D.Va. 2010) [hereinafter *Dragas II* ], and thus the court presents their provisions in a more summary form here. The three BMIC policies are as follows: Policy No. CPP 0013394 03, a commercial package policy for the period of February 5, 2006 to February 5, 2007; Policy No. CPP 0029923 01, a commercial package policy for the period of March 1, 2008 to March 1, 2009; and Policy No. UMB 0008545 00, a commercial umbrella policy for the policy period of March 1, 2008 to March 1, 2009. The two FIC policies, a commercial package policy and a commercial umbrella policy, both Policy No. CPA 0120994–10, were for the period of February 5, 2007 to February 5, 2008. All of the five policies concerned contain commercial general liability ("CGL") coverage for *"those sums that [DMC] becomes legally obligated to pay as damages because of 'bodily injury' or*

---

**2.** Reduced sulfur gases are hydrogen sulfide, carbon disulfide, and or carbonyl sulfide.

**3.** The substance and extent of these communications is further described *infra* Section III.C.

*'property damage' to which [the] insurance applies."* [4] (emphasis added). The insurers further have the "right and duty to defend" Dragas against any "suit" seeking such damages. Thus, the insuring agreements have both indemnity and duty to defend provisions.[5]

DMC notified BMIC on January 27, 2009, of its intent to claim coverage for the damage caused by the installation of the Chinese drywall by sending it a notice of occurrence/claim form. BMIC notified DMC on February 3, 2009, that it was commencing an investigation under a reservation of rights to determine whether there was coverage under the policy, and engaged an independent investigator, Capstone ISG ("Capstone"), to conduct the review. At that time, BMIC also informed DMC that it believed that coverage was excluded by the "your work" exclusion. On March 16, 2009, after having met with Capstone, DMC met with BMIC and told them of the remediation program they planned to undertake.[6] BMIC informed them at the time that it believed several policy provisions precluded coverage.[7] On

April 6, 2009, BMIC officially denied coverage for DMC's claim.

Likewise, DMC notified FIC of its claim by submitting an ACORD General Liability Notice of Occurrence/Claim form on February 26, 2009. DMC sent a follow up letter to FIC on March 11, 2009, which detailed the proposed remediation plan. In response, FIC sent DMC a letter reserving its rights under the policy on March 26, 2009, and then denied coverage on May 12, 2009. Neither BMIC nor FIC were party to the remediation negotiations with the homeowners.

## C.

There are eight other insurance policies involved in this case, those carried by Porter–Blaine. Hanover and Citizens insured Porter–Blaine during the years when Cromwell Park and The Hampshires were built and while Porter–Blaine had subcontract agreements with DMC. From 2005–2009, Porter–Blaine carried four commercial package policies from Citizens, all policy number ZBR 7905525, and four

4. The language in the 2008 BMIC umbrella policy varies slightly, covering "the 'ultimate net loss' in excess of the 'retained limit' because of 'bodily injury' or 'property damage' to which [the] insurance applies." "Ultimate Net Loss" is then defined as "the total sum ... that the insured *becomes legally obligated to pay* by reason of settlement or judgments or any arbitration or other alternate dispute method entered into with [BMIC's] consent." (emphasis added). Additionally, the 2007 FIC umbrella policy covers "the 'ultimate net loss' the 'insured' *becomes legally obligated to pay* as damages ... to which this insurance applies." (emphasis added) "Ultimate net loss" is defined as "the sums which [the insured] [has] paid or [is] responsible for paying either by adjudication or compromise providing that we have agreed in writing to settle losses covered under this policy." Thus, the court views these terms as having the same substantive meaning, and the 2008 BMIC umbrella policy and 2007 FIC umbrella policy will be

interpreted together with the other three policies at issue.

5. Only the indemnification question is presented here, as DMC is seeking repayment by its insurers for the sums it spent remediating the affected houses. No insurer denied its duty to defend, and thus issues of waiver because of such a denial are not before the court. *See infra* note 17; *see also Dragas II*, 709 F.Supp.2d at 447 n. 13 (noting that BMIC agreed to defend DMC for lawsuits filed).

6. It is a disputed issue between the parties whether DMC informed BMIC that it was pursuing homeowner claims under the policy or whether it was pursuing only claims for remediation costs.

7. It is a disputed issue among the parties whether BMIC agreed to DMC's remediation program at that meeting either by not objecting to it or by actively agreeing that DMC should begin remediation.

umbrella policies from Hanover, all policy number UHR 7917898. Each of those policies similarly contained CGL coverage for *"those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies."*[8] At the time the subcontract agreements were executed, DMC was named as an additional insured on the policy. Before this third party complaint was filed against Hanover and Citizens, DMC did not notify either insurer that it was claiming remediation costs due to the damaged caused by the Chinese drywall.

## D.

This suit was initially instituted by BMIC against DMC and FIC on April 23, 2009, seeking a declaratory judgment that BMIC owed no duty to indemnify DMC for its losses related to the Chinese drywall. FIC answered the complaint and filed a crossclaim against DMC on May 21, 2009. DMC answered the complaint and the crossclaim by FIC on June 22, 2009, and filed a counterclaim against BMIC and a crossclaim against FIC. Additionally, DMC filed a third-party complaint against Hanover and Citizens on July 6, 2009. Hanover and Citizens answered the complaint on August 21, 2009.

BMIC filed a motion to strike Counts I and II and a motion to dismiss Counts III and IV of the counterclaim on July 14, 2009. FIC filed an additional motion to dismiss the crossclaim on July 21, 2009. FIC's and BMIC's motions to dismiss were predicated upon the argument that DMC had failed to show a legal obligation to pay damages as required by the policies for coverage to attach. The court considered the three motions together, and on March 24, 2010, denied BMIC's motion to strike and granted BMIC's and FIC's motions to dismiss. *See Dragas I*, 709 F.Supp.2d 432, 441 (E.D.Va.2010). As a result, the court dismissed DMC's counterclaim and crossclaim without prejudice.

DMC filed an amended counterclaim and crossclaim on April 7, 2010. BMIC and FIC moved to dismiss the amended counterclaim and crossclaim, respectively, on April 26, 2010. The parties again argued that DMC had failed to adequately plead a legal obligation to pay damages. The court denied the motions on July 15, 2010, finding that DMC had at least met its burden of proof under Federal Rule of Civil Procedure 12(b)(6). *See Dragas II*, 709 F.Supp.2d 441, 450 (E.D.Va.2010).[9]

Each of the parties in this case has filed a motion for summary judgment. DMC filed a motion for partial summary judgment against BMIC on December 31, 2010. BMIC responded on January 14, 2011, and DMC replied on January 21, 2011. FIC and BMIC filed their motions for summary judgment on January 24, 2011, and January 25, 2011, respectively. DMC replied in opposition to both motions on February 10, 2011, and FIC and BMIC replied on February 18, 2011. Hanover and Citizens filed their joint motion for summary judgment on January 28, 2011, DMC replied in opposition on February 11, 2011, and Han-

---

**8.** Of the Hanover umbrella policies, only the 2005–2006 policy contains this exact wording. The subsequent three policies cover, as does the 2006 BMIC umbrella policy, "the 'ultimate net loss' in excess of the 'retained limit' because of 'bodily injury' or 'property damage.'" *See supra* note 4. "Ultimate net loss" is again defined as "the total sum ... that the insured becomes legally obligated to pay by reason of settlement or judgments or any ar-

bitration or other alternate dispute method entered into with [Hanover's] consent." However, as explained above, this court views the two versions of policy language as having the same purpose and effect, and thus construes all policies in this case together.

**9.** The court's ruling on these two motions to dismiss is discussed in depth *infra* Section III.B.

over and Citizens replied on February 18, 2011. Now, each of these motions for summary judgment, whether partial or in full, is ripe for decision by the court.

## II.

Summary judgment is appropriate when a court, viewing the record as a whole and in the light most favorable to the non-moving party, finds that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Terry's Floor Fashions, Inc. v. Burlington Indus., Inc.*, 763 F.2d 604, 610 (4th Cir.1985). A party opposing a motion for summary judgment may not rest on the pleadings alone, but must instead show that "specific, material facts exist that give rise to a genuine triable issue." *Hagan v. McNallen (In re McNallen)*, 62 F.3d 619, 623–24 (4th Cir.1995). In essence, the non-movant must present "evidence on which the [trier of fact] could reasonably find" for the non-moving party. *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505. Such facts must be presented in the form of exhibits and sworn affidavits. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also M & M Med. Supplies & Serv., Inc. v. Pleasant Valley Hosp., Inc.*, 981 F.2d 160, 163 (4th Cir.1993) ("A motion for summary judgment may not be defeated by evidence that is 'merely colorable' or 'is not sufficiently probative.'" (quoting *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505)).

On summary judgment, the court is not to "weigh the evidence and determine the truth of the matter." *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505. Instead, the court will draw any permissible inference from the underlying facts in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). But a failure by a plaintiff to rebut a defendant's motion with sufficient evidence will result in summary judgment when appropriate. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322, 106 S.Ct. 2548; *see also Felty v. Graves–Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir.1987) (finding district courts have an "affirmative obligation ... to prevent 'factually unsupported claims and defenses' from proceeding to trial." (citing *Celotex Corp.*, 477 U.S. at 323–24, 106 S.Ct. 2548)).

## III.

Each of the parties has moved for summary judgment on separate, yet overlapping grounds. The court need only consider the motions filed by the insurers, as the court finds they are dispositive.[10] The insurers have raised issues concerning exclusions to the policy, including the pollution exclusion, voluntary payments exclusion, and your work exclusion, among others. However, the court finds this case to be decided for each insurer on one issue concerning the basic coverage the policy provides, and the court only considers that question in this Opinion. The issue is one which is familiar to the court. Indeed,

---

10. DMC has moved for partial summary judgment against BMIC on the grounds that they were "legally obligated to pay" the sums expended "as damages," that BMIC is liable to pay for two occurrences, and that the "your work" exclusion does not bar coverage. As the court finds that DMC cannot meet the basic requirements of the policy, its "legally obligated" argument is obviated and the court need not consider DMC's arguments on the other policy issues.

there have been two published opinions in this case on this exact question. What the court finds decisive at this juncture in this case is that DMC had no "legal obligation" to incur the remediation costs ·"as damages," and thus coverage is not available under any of the policies.

■ It is a failure to meet the substantive coverage provisions of the policies, not one of the exclusions, that precludes insurance coverage. Simply put, the court is not free to rewrite the contracts between the parties, *see Pilot Life Ins. Co. v. Crosswhite*, 206 Va. 558, 145 S.E.2d 143, 146 (1965) ("It is the function of the court to construe the language of the contract as written, and the court cannot make a new contract for the parties different from that plainly intended and thus create a liability not assumed by the insurer."), and though this case may stand for the oft-repeated phrase "no good deed goes unpunished," the court **GRANTS** BMIC's, FIC's, Hanover's, and Citizens' motions for summary judgment.

## A.

■ The four insurers argue that DMC has not met the requirements for coverage to attach because DMC was not legally obligated to pay the remediation costs as damages as is required to trigger CGL coverage. The essence of CGL coverage is that it indemnifies business entities against losses as a result of legal liability, and it provides coverage in the form of a legal defense to lawsuits. Thus, the insurers argue, "[t]here is not a single Virginia case holding that in the context of third

party insurance a policyholder can be 'legally obligated' to pay anything 'as damages' where no judgment has been rendered and no suit has been filed." BMIC Mem. Support Mot. Summ. J. at 22. Furthermore, "[b]y DMC's own admission, there were no lawsuits pending against it when it incurred the Remediation Costs and no judgment has ever been entered against DMC obligating it to incur the Remediation Costs." Hanover & Citizens Mem. Support Mot. Summ. J. at 15. In conclusion, the insurers argue that DMC has made no further showing than it had previously at the motion to dismiss stage, and thus "[t]he fact development in this lawsuit has revealed no basis on which DMC was legally obligated to pay the Remediation Costs as damages." FIC Mem. Support Mot. Summ. J. at 19.

DMC reiterates is earlier arguments concerning legal obligation from its briefs on the motion to dismiss.[11] DMC submits that the plain language of the insurance agreements requires the conclusion that it had a legal obligation to pay damages because the plain meaning of "legal obligation" supports the payment of remediation expenses. Furthermore, the national proliferation of homeowner suits against developers and contractors who built homes with Chinese drywall demonstrates that there was a significant legitimate concern about liability. Finally, the insurers cannot object to any settlement achieved by DMC because they denied coverage from the beginning and thereby waived the "voluntary payment" and "no action" clauses.[12]

11. Indeed, DMC does not even brief the issue in its response to BMIC's motion and rather simply refers the court back to its earlier submissions. Although the insurers bear the burden of· proof as the moving · party, the practice of referring to prior submissions is disfavored, particularly given the different procedural posture of the two motions and

the amount of discovery that has occurred since the initial motions to dismiss.

12. The voluntary payments provision reads that "[n]o insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent." This provision is a defense to cov-

## B.

The court, as stated above, has previously considered this question twice before. Initially the court dismissed DMC's counterclaim against BMIC and crossclaim against FIC "[b]ecause [DMC] has failed to allege facts that, taken as true, could lead to the conclusion that [DMC] was 'legally obligated to pay' Chinese-drywall related costs 'as damages.'" *Dragas I*, 709 F.Supp.2d at 440. The court initially observed that "[c]ourts are split as to whether a 'legal obligation' to pay can arise before a lawsuit is filed against the insured." *Id.* at 438 (citing *Detroit Water Team Joint Venture v. Agric. Ins. Co.*, 371 F.3d 336, 339 (6th Cir.2004); *Potomac Ins. of Ill. v. Huang*, No. 00–4013–JPO, 2002 WL 418008, at *10 n. 3 (D.Kan. Mar. 1, 2002)). Indeed, the court found no case which had addressed the issue before it under Virginia law. *Id.* However, the court observed that "even if a 'legal obligation' to pay may arise before a lawsuit has been filed in Virginia, such circumstances would be rare." *Id.* (citing *Potomac Ins.*, 2002 WL 418008, at *10 n. 3). Thus, the court dismissed the DMC's complaints without prejudice, finding that because DMC had "failed to specifically allege any threats of lawsuits by individual homeowners, or even that specific demands were made by the homeowners before the [remediation] plan was implemented," it could not meet the pleading standard under Federal Rule of Civil Procedure 12(b)(6). *Id.* at 439.

After DMC filed its amended counterclaim and crossclaim and BMIC and FIC again moved to dismiss, the court found that DMC had corrected the factual deficiencies identified in the initial complaints. The court was still "unwilling to find that the threat of litigation is itself sufficient to support a 'legal obligation' to pay sums 'as damages,'" *Dragas II*, 709 F.Supp.2d at 447; however, it did find that "such explicit threats [of litigation], coupled with [DMC's] other factual allegations, are at least sufficient to survive the present motions to dismiss," *id.* The court concluded, however, that it made "no determination ... as to whether [DMC] will ultimately be able to prove that it was under a 'legal obligation' to pay sums 'as damages.'" *Id.*

## C.

The same issue that concerned the court in *Dragas I* and *II* is again the focus of the court's attention. Discovery has concluded, and while facts concerning attorney contact and threats of litigation are now in the form of admissible evidence, rather than as part of the pleadings, no further information has been unearthed as to the number, nature, and timing of attorney contacts. The undisputed facts are as follows: [13]

● Attorney Richard Serpe ("Serpe") contacted DMC beginning on February 17, 2009, concerning his representation of multiple homeowners whose homes contained Chinese drywall.

---

erage, *see Safeway Moving & Storage Corp. v. Aetna Ins. Co.*, 317 F.Supp. 238, 243–244 (E.D.Va.1970) (finding a similar provision, the "cooperation clause," to be a defense). The no action clause provides "[n]o person or organization has a right under this Coverage Part ... [t]o sue us on this Coverage Part unless all of its terms have been fully complied with." The no action clause chiefly prevents suits against the insurer until there

has been a final determination of liability on the part of the insured, either with the insurer's consent or after a denial of coverage by the insurer. *See infra* note 17.

**13.** These facts are all taken from the Declaration of Kristan Burch submitted with DMC's motion for partial summary judgment, *see* Docket # 122, which was then reproduced in the insurers' motions for summary judgment.

- On February 24, 2009, Serpe told DMC that unless DMC bought back the homeowners' homes, he would file a federal class action lawsuit. No such suit was filed.
- Attorney Michael J. Kassoff contact DMC on behalf of a homeowner on March 2, 2009, and against on March 14, 2009, demanding action by DMC and threatening a suit. No such suit was filed.
- Attorney Richard S. Lewis contacted DMC on behalf of fourteen homeowners on March 16, 2009, inquiring as to potential remedies for the Chinese drywall outside of litigation, including the option of DMC buying back the affected homes. No suit was filed.
- An attorney with the law firm of Troutman Sanders contacted DMC on April 27, 2009, concerning a potential claim by a homeowner. Another attorney later threatened a suit on behalf of this homeowner. No suit was filed.
- Attorney Charles LaDuca ("LaDuca") contacted DMC on behalf of twelve homeowners on May 12, 2009, inquiring as to how to serve notice of a suit he was bringing on the homeowners' behalf.
- On May 22, 2009, one Hampshires homeowner informed DMC to direct all further communication to his attorney, William H. Anderson ("Anderson"), who threatened to file suit against DMC on June 8, 2009.
- Four lawsuits were filed against DMC in Chesapeake Circuit Court on June 18, 2009, by LaDuca and Anderson on behalf of four homeowners.
- Nonsuits by plaintiffs were filed in those four cases on July 8, 2009, which were entered by the court on July 20, 2009.
- DMC received additional threats of litigation from homeowners themselves should DMC not buy back their homes.

No other suits, besides the four filed in Chesapeake Circuit Court which ended quickly due to voluntary nonsuits taken by the plaintiffs, resulted from any of the attorney contacts and demands. As recounted previously, DMC ultimately, on its own volition, signed a remediation agreement with every affected homeowner.

**D.**

The court previously noted that it is "unwilling to find that the threat of litigation is itself sufficient to support a 'legal obligation' to pay sums 'as damages,'" *Dragas II*, 709 F.Supp.2d at 447, and there has been no further law or fact brought to the court's attention which would lead to a reconsideration of this decision. There are two fundamental issues: (1) whether an insured may be "legally obligated" to pay sums which are not the result of litigation, either as a final judgment or a settlement; and (2) whether those sums are "damages" within the meaning of the policy.

■ As to the first question, the majority of courts to have considered the question have held that in order for an insured to be "legally obligated," there must have been either a final judgment or a settlement as the result of a suit. *See Permasteelisa CS Corp. v. Columbia Cas. Co.*, 377 Fed.Appx. 260, 264–65 (3d Cir.2010) (unpublished) (citing *Bacon v. Am. Ins. Co.*, 131 N.J.Super. 450, 330 A.2d 389, 393 (N.J.Super. Ct. Law Div.1974)); *Detroit Water Team Joint Venture v. Agric. Ins. Co.*, 371 F.3d 336, 339 (6th Cir.2004) ("[T]he term 'legal obligation' requires either a judicial determination of liability or a settlement between the insurer, insured, and the claimant."); *Stanford Trading Co. v. Nationwide Mut. Ins. Co.*, 237 F.3d 631, 2000 WL 1701741 (5th Cir.2000) (per curiam) (unpublished table decision); *Klein v. Fid. & Deposit Co. of Am.*, 117 Md.App. 317, 700 A.2d 262, 271 (Md.Ct.

Spec.App.1997) (holding letters which warned that claims were imminent were not sufficient to show a "legal obligation" to pay). *Cf. Monarch Greenback L.L.C. v. Monticello Ins. Co.,* 118 F.Supp.2d 1068, 1075 (D.Id.1999) (holding that a demand letter was not sufficient to trigger the insurer's duty to defend under the policy).

■ Two cases present facts similar to the instant situation and are particularly useful to consider. First, in *Cincinnati Insurance Co. v. Crossmann Communities Partnership,* No. 05–470–KSF, 2008 WL 852133 (E.D.Ky. Mar. 28, 2008) (unpublished), the District Court in the Eastern District of Kentucky was faced with the question of whether Crossman Communities Inc. could recover the costs it expended in remediating homes it improperly constructed under its CGL policy. There, as here, no homeowner filed a lawsuit as a result of the faulty construction. The court concluded that the CGL policy did not cover such remediation costs because there had been no legal determination of liability or approved settlement. *Id.* at *5 ("[T]he court is reluctant to say that a written demand alone, without the coercive force of a lawsuit, can be considered a process that could result in the insured being 'legally obligated to pay.'" (internal quotation marks omitted)).

Second, in *Nationwide Mutual Insurance Co. v. Regional Electric Contractors, Inc.,* 111 Md.App. 80, 680 A.2d 547 (Md.Ct. Spec.App.1996), the Court of Special Appeals of Maryland considered a similar question with regard to voluntary remediation. In that case, Regional Electric Contractors, Inc. ("Regional") accidentally damaged a switchboard during one of its projects. Regional then voluntarily repaired the damage. It sought to recover under its CGL policy for the sums expended, but the court held if the insurer was "obligated to indemnify Regional before Regional was found to be 'legally obligated

to pay,' [it would] expand[ ] the policy's coverage to an extent contemplated neither by [the insurer] nor by Regional." *Id.* at 552. As it was not within the court's discretion to expand the insurance contract beyond the parties' understanding, no coverage was available for the remediation costs.

A minority of courts, however, have held that "legal obligation" does not require a determination of liability by a court or consent by the insurer. *See Potomac Ins.,* 2002 WL 418008, at *10 (holding that an insured may recover sums paid as part of a reasonable settlement made in good faith). *Cf. Nat'l Union Fire Ins. Co. of Philadelphia v. Porter Hayden Co.,* 408 B.R. 66, 72 (D.Md.2009) (holding that a suit is not necessary to trigger the duty to defend, the question is whether an insured is legally obligated to pay damages under the law). In particular, in cases of environmental pollution and its regulation by state and federal entities, the courts have been more willing to find sums paid to remediate damage done to specific property or to pay into a state cleanup fund to be the result of "legal obligation." *See Colonial Gas Co. v. Aetna Cas. & Sur. Co.,* 823 F.Supp. 975, 979 (D.Mass.1993) (holding that when an insured voluntarily paid into an environmental settlement fund, "requiring an insured to go through the motions of inviting and answering a lawsuit when having no genuine defense would be contrary to the public policy of guarding the courts against unnecessary litigation." (internal quotation marks and citation omitted)); *Bausch & Lomb Inc. v. Utica Mut. Ins. Co.,* 330 Md. 758, 625 A.2d 1021, 1032 (Md.Ct.App.1993) (holding that because Bausch & Lomb was subject to a strict liability environmental statute, it was "legally obligated" to pay response costs for compliance with that statute).

■ As to the second question, whether the cost of remediation is "damages" with-

in the scope of the policy, again courts are split. Some courts have strictly held that "damages" must be the result of a lawsuit. *See, e.g. Patrons Oxford Mut. Ins. Co. v. Marois,* 573 A.2d 16, 18 (Me.1990) (holding that "damages" is not ambiguous and environmental cleanup and containment costs do not so constitute). *Contra Megonnell v. United Services Auto. Assoc.,* 368 Md. 633, 796 A.2d 758, 767 (Md.Ct.App.2002) ("Damages are not limited to court-ordered payments; they can be claims made prior to trial that are resolved by settlements requiring the payment of sums of money."). By contrast, other courts have held that "damages" has a non-technical meaning and remediation costs are within the scope of the policies. *See Helena Chem. Co. v. Allianz Underwriters Ins. Co.,* 357 S.C. 631, 594 S.E.2d 455, 458 (2004); *Morrow Corp. v. Harleysville Mut. Ins. Co.,* 101 F.Supp.2d 422, 434 (E.D.Va. 2000) (Ellis, J.) (holding that environmental remediation costs resulting from settlement of a third-party lawsuit where the insurer refused to indemnify or defend were "damages" under the policy);[14] *Bausch & Lomb,* 625 A.2d at 1032–33 (holding that the Fourth Circuit's prior interpretation of Maryland law in *Maryland Cas. Co. v. Armco, Inc.,* 822 F.2d 1348 (4th Cir.1987), that "damages" had a technical meaning was incorrect); *C.D. Spangler Constr. Co. v. Indus. Crankshaft & Eng'g Co., Inc.,* 326 N.C. 133, 388 S.E.2d 557, 568 (1990).

### E.

Examining the aforementioned cases, this court is unwilling to find on summary judgment that the mere threat of litigation, without more, constitutes a "legal obligation to pay" under the insurance policies, and sums paid because of these "threats" cannot thereby constitute damages which the insurer must bear. To hold otherwise would be contrary to the weight of authority and the plain language of the insurance agreements entered into by the parties. This court instead follows the decisions of the courts in *Crossmann Communities* and *Regional Electric Contractors* and holds that when an insured voluntarily remediates damage, the insured is not "legally obligated to pay" and coverage does not attach to any such sums paid by the insured. In the absence of a final judgment or a settlement of a lawsuit, a strict liability statute, or other coercive legal obligation, an insured cannot be said to have any legal obligation voluntarily to commence remediation.[15] Demands under

14. *Morrow* is the only case of which this court is aware that interprets remediation costs as "damages" within the context of Virginia law. In that case, a shopping center brought suit against a drycleaner seeking damages and injunctive relief for contamination of the soil and groundwater because of discharge of drycleaning chemicals. The defendant drycleaner's insurers refused to indemnify or defend the drycleaner based on the various pollution exclusions in their policies. As a result, the drycleaner settled with the plaintiff shopping center and then instituted a new suit against the insurer to recover the settlement amount under its CGL policy. The court held that such a third-party lawsuit seeking restitution for environmental remediation does seek "damages" under Virginia law as that term is commonly understood. *See Morrow,* 101

F.Supp.2d at 434–35. However, *Morrow* has limited import in the case at bar because whether the costs were "damages" was dependent on (1) the fact of the underlying suit and settlement thereof, and (2) the insurer's refusal to defend, two facts not present here. *See infra* notes 15 and 16. Moreover, the court in *Morrow* addressed the issue of "damages" in the context of the "pollution exclusion," not in the context of "legal obligation to pay," as such a legal obligation was undisputed given the underlying lawsuit and the denial of the duty to defend.

15. Moreover, even though four lawsuits were filed against DMC, DMC has admitted that it voluntarily began its remediation plan before a lawsuit had been filed against it, and the four lawsuits that were filed were all volun-

the guise or potential of a legal right are not sufficient to create a legal obligation to pay by the insured, and sums expended in response to such demands do not constitute "damages" under the insurance policies at issue. There is no case concerning Virginia law of which the court is aware, including *Morrow*, where sums voluntarily expended to remediate were held to be damages without an underlying lawsuit.[16] Therefore, the requirements for coverage have not been met and the BMIC, FIC, Citizens, and Hanover policies do not apply.[17]

### IV.

Accordingly, the court **GRANTS** BMIC's, FIC's, Citizens' and Hanover's motions for summary judgment and **DENIES** DMC's motion for partial summary judgment. Therefore, the Clerk is **DIRECTED** to enter judgment for the insurers as to the complaint, counterclaim, crossclaim, and third-party complaint. The Clerk is **DIRECTED** to forward a copy of this Opinion to counsel for all parties.

**IT IS SO ORDERED.**

tarily dismissed by the homeowners before the parties were even at issue and without a settlement agreement. In this regard, the case at bar again differs from *Morrow*. *See supra* note 14.

16. *See supra* note 15 and accompanying text. Further, this is not a case about "duty to defend" by the insurer. *See supra* note 5 and *infra* note 17. Nor is this a case about a "pollution exclusion" clause in an insurance contract. *See supra* note 14.

17. For this same reason, namely that the issue is not one of a procedural technicality or an exclusion to the policy but rather one

where the basic requirements for coverage have not been met, DMC's waiver argument is unavailing. Waiver of a policy condition cannot create coverage, instead it merely prevents the insurer from enforcing a procedural policy condition after it has denied coverage. *Norman v. Ins. Co. of N. Am.*, 218 Va. 718, 239 S.E.2d 902, 907–08 (1978). In other words, waiver cannot bring a claim within the policy if the policy affords no coverage under its basic terms. As there is no coverage from DMC's remediation because DMC was not "legally obligated to pay" the costs "as damages," the doctrine of waiver is inapposite here.